UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

MICHIGAN SALT PRODUCTS, LLC,

|  |  |  |
|---|---|---|
| | Plaintiff, | **COMPLAINT** |
| -against- | | Civil Action Number |
| | | <u>1:11-CV-1023</u> (LEK/RFT) |

SCOTWOOD INDUSTRIES, INC.,
E.C.O. S.P.R.L., and BNP PARIBAS
FORTIS a/k/a FORTIS BANK S.A./N.V.,

Defendants.
-------------------------------------------------------

Plaintiff, Michigan Salt Products, LLC, by its attorneys, Whiteman Osterman & Hanna

LLP for its complaint herein alleges as follows:

## PRELIMINARY STATEMENT

1.      In this action, Plaintiff Michigan Salt Products, LLC ("Michigan Salt") seeks to

recover possession of approximately 7,000 metric tons of bulk sea salt worth $400,000, for

which it paid in full, but which defendants are preventing Michigan Salt from possessing.

Michigan Salt further seeks damages against defendant E.C.O. sprl for breach of its contract to

sell it bulk sea salt in conformance with contract specifications.

## PARTIES

2.      Plaintiff Michigan Salt Products, LLC ("Michigan Salt") is a limited liability

company organized pursuant to the laws of the State of Michigan, with a principal place of

business in Orion, Michigan.

3.      Upon information and belief, Defendant E.C.O. sprl ("E.C.O") is a corporation organized pursuant to the laws of Belgium, with a principal place of business in Sart-Bernard, Belgium.

4.      Upon information and belief, Defendant BNP Paribas Fortis a/k/a Fortis Bank S.A./N.V. ("BNP Paribas Fortis") is a corporation organized pursuant to the laws of Belgium, with a principal place of business in Brussels, Belgium.

5.      Upon information and belief, Defendant Scotwood Industries, Inc. ("Scotwood") is a corporation organized pursuant to the laws of the State of Kansas, with a principal place of business in Overland Park, Kansas.

## JURISDICTION & VENUE

6.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. §1332 as the plaintiff's citizenship is diverse from that of all defendants and the amount in controversy is in excess of $75,000 U.S, and also by virtue of 28 U.S.C. §1331 by reason of a claim to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §1 et seq.

7.      Venue is proper in this district under 28 U.S.C. 1391(a) as a substantial part of the property that is the subject of this litigation is located in this district.

## THE E.C.O. CONTRACT

8.      Michigan Salt is in the business of selling road salt products in the United States.

9.      On or about April 8, 2011, Michigan Salt entered into a contract with E.C.O. (the "E.C.O. Contract"), under which E.C.O. agreed to supply 150,000 metric tons (plus or minus 10%) of Egyptian raw white sea salt in bulk in shipments of between 30,000 and 65,000 metric

tons at a price of $29.00 U.S. per metric ton.  The 30,000 metric ton delivery was a test shipment.

10.     The E.C.O. Contract required the salt to meet certain specifications with a permitted variation of plus or minus ten percentage points, to wit: (a) moisture (dry base) of less than 3%; (b) insoluble salt content of less than 0.9%; (c) calcium (Ca) content of less than 0.4%; (d) magnesium (Mg) content of less than 0.4%; (e) sulfate (SO4) content of less than 2%; (f) potassium (K) content of less than 0.1%; (g) with grain size variation (gradation) limited to between 1.5 millimeters and 6 millimeters; and (h) with a sodium (NaCL) content of more than 97%.

11.     The E.C.O. Contract provided that the salt shipments would be made from New Port, Damietta Egypt.

12.     The E.C.O. Contract provided that E.C.O would be liable for demurrage charges at the port of shipment arising from problems or delays with the loading of the vessel, except for demurrage charges arising from force majeure events, such as natural disaster, earthquakes, hurricanes, floods, tornados, fires, or wars, riots or other major upheavals.

13.     The E.C.O. Contract provided that E.C.O. was responsible to have an analysis of the salt performed by SGS, an independent laboratory, at the time the salt was to be loaded, and to provide an SGS-certified report on salt sieve sizing, moisture content and a draft survey of the remaining constituents before Michigan Salt would be responsible to pay.

14.     The E.C.O. Contract provided that Michigan Salt would pay E.C.O. 35% of the contract price upon execution of the Contract; 25% at the beginning of the loading; and 40% against the following documents: (a) a page labeled Document Two of the seller's invoice; (b) two original Bills of Lading; and (c) a quality certificate issued by SGS provided by E.C.O. to

Michigan Salt, showing the salt to meet the Contract specifications, and including the draft survey, sieve size of the salt loaded onto the ship, and moisture content test result.

15.     The E.C.O. Contract identified the following as E.C.O.'s bank and account: BNP Paribas Fortis, Avenue Joseph Abras, No. 76 5001, Belgrade, Belgium, Swift Code GEBABEEB, Account Number IBAN: BE30001581169011.

16.     E.C.O. contracted with Ghadan Company for Marketing, Management and Commerce ("Ghadan"), a company in Damietta, Egypt, for the supply of the salt to Michigan Salt.

## THE SCOTWOOD CONTRACT

17.     On or about April 14, 2011, Michigan Salt entered into a contract with Scotwood ("Scotwood Contract") for the sale and purchase of 32,000 metric tons (plus or minus 10%) of sea salt in bulk, to be delivered by May 30, 2011 by ocean going vessel arranged by Michigan Salt from Damietta, Egypt to the Port of Coeymans, New York at a price of $67.75 per metric ton.

18.     The Scotwood Contract set forth certain specifications for the quality of salt to be delivered.

## SHIPMENT; PAYMENTS; HOLDS ON BILLS OF LADING

19.     On or about April 8, 2011, Michigan Salt chartered with the freight shipping line of Lauritzen Bulkers A/S ("Lauritzen Bulkers") to transport 29,350.00 metric tons of the foregoing salt cargo from the port of Damietta, Egypt to the Port of Coeymans, New York at a freight charge of $25.50 U.S. per metric ton.

20.     The foregoing 29,350.00 metric tons of bulk salt was consigned as follows:

(a)     Ghadan caused Marine Ind. & Transit Co., care of Ahmed Lotfy Zakarya, to consign to order the following cargo placed in the custody of Lauritzen Bulkers for shipment on the vessel M/V Maren Bulker to the Port of Coeymans, New York: 13,735.997 metric tons of sea salt in bulk under Bill of Lading No. LBUL36591103001, issued at Damietta, Egypt on May 7, 2011 (hereinafter "Bill of Lading No.1").

(b)     Ghadan caused Marine Ind. & Transit Co., care of Ahmed Lotfy Zakarya, to consign to order the following cargo in the custody of Lauritzen Bulkers for shipment on the vessel M/V Maren Bulker to the Port of Coeymans, New York: 8,061.180 metric tons of sea salt in bulk under Bill of Lading No. LBUL365911030002, issued at Damietta, Egypt on May 7, 2011 (hereinafter "Bill of Lading No. 2").

(c)     Ghadan caused Marine Ind. & Transit Co., care of Ahmed Lotfy Zakarya, to place the following cargo in the custody of Lauritzen Bulkers for shipment on the vessel M/V Maren Bulker to the Port of Coeymans, New York: 7,552.823 metric tons of sea salt in bulk under Bill of Lading No. LBUL365911030003, issued at Damietta, Egypt on May 7, 2011(hereinafter, "Bill of Lading No. 3").

21.     Upon information and belief, under the terms of shipment, three originals of each of the foregoing three Bills of Lading were to be presented to E.C.O.'s bank, BNP Paribas Fortis, in exchange for payment on behalf of E.C.O. under the contract between E.C.O. and Ghadan.

22.     E.C.O. would then present documents set forth in paragraph 14 above to Michigan Salt, and Michigan salt would present the foregoing three Bills of Lading to Lauritzen Bulkers, which would then instruct the Master of M/V Maren Bulker to discharge the salt cargo at the Port of Coeymans, New York, into the possession of Michigan Salt.

23.    The salt purchased by E.C.O. from Ghadan for Michigan Salt did not comply with the specifications of the E.C.O. Contract.

24.    E.C.O. failed to cause Ghadan to conduct the testing required by the E.C.O. Contract.

25.    E.C.O. failed to provide Michigan Salt with a quality certificate issued by SGS laboratory as required by the E.C.O. Contract.

26.    The failure or refusal of E.C.O. to conduct said testing and to furnish the foregoing quality certificate caused delays in the loading of the shipments of salt onto the M/V Maren Bulker.

27.    E.C.O. further failed to make the complete shipments of salt available for loading upon the M/V Maren Bulker in a timely fashion when the ship arrived at Damietta, Egypt for loading on or about April 26, 2011 at 1742 hours.

28.    Due to the failure of E.C.O. to make complete shipments of salt available for loading in a timely fashion, it took eleven days, until May 7, 2011 at 2000 hours to complete loading of the vessel.

29.    Said delays in loading the shipments of salt caused Michigan Salt to incur $59,368.75 U.S. in demurrage charges invoiced by Lauritzen Bulkers, which charges Michigan Salt paid in full.

30.    M/V Maren Bulker eventually sailed from Damietta, Egypt on or about May 8, 2011 with the shipments of salt bound for the Port of Coeymans, New York.

31.    M/V Maren Bulker arrived at the Port of Coeymans, New York on or about May 25, 2011 with the shipments of salt and cleared customs on or about May 26, 2011.

32.    Michigan Salt paid Lauritzen Bulkers in full for the freight and demurrage charges invoiced with respect to the shipments of salt.

33.    Michigan Salt had the cargo surveyed and determined that the salt shipment failed to meet the specifications of the E.C.O. Contract.  Specifically, the grain sizes were not within the range specified by the E.C.O. Contract, and the SGS analysis required by the E.C.O. Contract was not furnished to Michigan Salt.

34.    Nonetheless, Michigan Salt paid E.C.O. in full for the shipment while reserving all of Michigan's legal and contractual rights.

35.    Specifically, Michigan Salt paid E.C.O. a total of $851,150 U.S., constituting the full payment under the E.C.O. Contract for 29,350 metric tons of salt at a price of $29 U.S. per metric ton, by wire transfer on the following dates in the following amounts: $304,500 on April 8, 2011; $217,500 on April 26, 2011, $152,715 on May 20, 2011, and $176,435 on May 25, 2011.

36.    Upon Michigan Salt's full payment, E.C.O. was required by its contract to cause BNP Paribas Fortis release any and all holds on the original Bills of Lading so that Michigan Salt could obtain the necessary documents, including especially the Bills of Lading to take clear title to the salt.

37.    E.C.O. failed to have BNP Paribas Fortis release the original Bills of Lading. Rather, it caused or permitted Ghadan to assert a purported "lien" against the Bills of Lading for non-payment.

38.    Upon information and belief, BNP Paribas Fortis held and continues to hold two Bills of Lading of each of the three sets of original Bills of Lading in its custody.

39.    That hold on the original Bills of Lading is unlawful.

40.    Lauritzen Bulkers demanded the presentation of the original Bills of Lading held by BNP Paribas Fortis as a condition to its discharge of the salt cargo free and clear of liens to Michigan Salt.

41.    Michigan Salt sent proof of full payment to BNP Paribas Fortis and to E.C.O., with a request that they release the hold on the original Bills of Lading.

42.    E.C.O. nonetheless failed or refused to cause BNP Paribas Fortis to release its hold on the Bills of Lading so that Michigan Salt could receive delivery of the salt with clear title.

43.    Upon proof of full payment directly furnished by Michigan Salt, Lauritzen Bulkers released the salt cargo into the custody of the Port of Coeymans, New York, but continued to maintain that the presentation of the original Bills of Lading was required for Michigan Salt to have clean title. Lauritzen also demanded undertakings and indemnity from Michigan Salt and the Port of Coeymans in the event of third-party claims arising from the release of the cargo.

44.    The acts and omissions of defendants in their failure or refusal to release the original Bills of Lading to Michigan Salt have caused Michigan Salt to incur damages, including without limitation additional demurrage charges at the Port of Coeymans, New York in the amount of $6,500 U.S.

45.    Upon receipt of E.C.O.'s partial payment, on or about June 8, 2011, Ghadan purported to release its "lien" against Bill of Lading No. 3 (7,552.823 metric tons of salt), but purported to maintain its "lien" against Bills of Lading Nos. 1 and 2.

46.    Upon presentation of the purported "lien release", and with the approval of Lauritzen Bulkers, the Port of Coeymans released a portion of the salt shipment to Michigan Salt.

47.    Scotwood represented to Michigan Salt that the salt did not meet the specifications of the Scotwood Contract, and demanded a discount off the contract price.

48.    Under the Scotwood Contract, the price to be paid by Scotwood for 29,350 metric tons of salt delivered at $67.75 per metric ton was $1,988,462.50.

49.    Scotwood made a deposit payment of $1,084,000 for the shipment.

50.    Upon delivery of the salt to the Port of Coeymans, it was determined that the salt did not meet specifications.

51.    Michigan Salt and Scotwood agreed to reduce the contract price under the Scotwood Contract for this shipment by an amount of $3.50 per ton, resulting in a total discount of $102,725 from the contract price, with the remaining amount due net of the deposit and demurrage fees of $6,180 totaling the sum of $795,257.50 due to Michigan Salt to Scotwood.

52.    Scotwood made payment of $395,257.50 to Michigan Salt in partial payment of the agreed discounted contract price.

53.    Scotwood took possession of the entire cargo of salt into its warehouse at the Port of Coeymans, New York, and thereafter bagged and removed portions of the salt cargo.

54.    Despite demand therefor, Scotwood refused to pay Michigan Salt the remaining $400,000 of the agreed-upon discounted price on the ground that Michigan Salt was unable to deliver the salt with clean title due to the hold on the original Bills of Lading caused by the remaining Defendants, and described in this Complaint.

55.    Approximately 7,000 metric tons of the salt, worth approximately $400,000, remain at the Port of Coeymans, New York in Scotwood's custody and control.

56.    Scotwood continues to bag and remove portions of the remaining salt from the Port of Coeymans, for which Scotwood has not paid Michigan Salt.

57.    Upon information and belief, Scotwood has in the past 14 days received additional large bulk shipments of salt at the Port of Coeymans, for which warehouse space is immediately needed.  As a result, Scotwood will in the immediate future remove additional portions of the remaining salt belonging to Michigan Salt, for which Scotwood has not paid.

58.    Michigan Salt intends to commence arbitration proceedings against Scotwood within the next thirty days, seeking damages for breach of the Scotwood Contract.


## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT SCOTWOOD FOR POSSESSION OF PROPERTY (REPLEVIN)

59.    Michigan Salt repeats and realleges paragraphs 1- 59 of this Complaint as if fully set forth herein.

60.    Michigan Salt is the full and unqualified owner, and is entitled to the present possession, of the following described property: Bulk Sea Salt in the approximate quantity of 7,000 Metric Tons.

61.    The property is of the actual value of $400,000, and Scotwood wrongfully detains possession of it from Michigan Salt at the Port of Coeymans, New York.

62.    The property was neither taken on an order or judgment of a court against the Michigan Salt, nor under an execution or judgment against Michigan Salt or against the property.

63. The alleged cause of detention of the property, according to the best belief of Michigan Salt is the failure of Defendants BNP Paribas Fortis, E.C.O and/or Ghadan to cause the release of the original Bills of Lading with respect to said property notwithstanding full payment by Michigan Salt.

64. Michigan Salt has sustained damages by reason of the wrongful detention in the sum of at least $400,000, plus pre-judgment interest, reasonable attorneys' fees and the costs of this action.

65. As a result of the wrongful detention of the property, Plaintiff is entitled to a judgment for the property and for the possession of it, or for the value of it if it cannot be found, and for damages and costs.

<u>**AS AND FOR A SECOND CAUSE OF ACTION AGAINST**</u>
<u>**DEFENDANT SCOTWOOD TO COMPEL ARBITRATION**</u>

66. Michigan Salt repeats and realleges paragraphs 1- 66 of this Complaint as if fully set forth herein.

67. Scotwood is required under the Scotwood Contract to submit disputes with Michigan Salt to arbitration.

68. A dispute exists between Michigan and Scotwood concerning the enforcement of the Scotwood Contract.

69. Michigan Salt is entitled to an order compelling Scotwood to submit to arbitration under the Federal Arbitration Act, 9 U.S.C. §1 et seq.

70. Scotwood is in wrongful possession of the subject matter of the dispute to be submitted to arbitration: 7,000 metric tons of bulk sea salt, for which Michigan Salt seeks payment of $400,000 under the Scotwood Contract.

71.     Michigan Salt is entitled under the Federal Arbitration Act to seizure or attachment of the subject matter of the dispute as a preliminary remedy in support of an action to compel arbitration.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS E.C.O. AND BNP PARIBAS FORTIS FOR SPECIFIC PERFORMANCE

72.     Michigan Salt repeats and realleges paragraphs 1-72 of the Complaint as if fully set forth herein.

73.     Michigan Salt fully performed its obligations under the E.C.O. Contract, including payment to E.C.O. in full and payment of all freight charges.

74.     E.C.O. has a legal and contractual obligation to convey to Michigan Salt free title to the salt cargo for which Michigan Salt paid in full.

75.     To convey free title, E.C.O. has a legal and contractual obligation to release the original Bills of Lading to Michigan Salt.

76.     Upon information and belief, all prerequisites for the release by BNP Paribas Fortis of the original Bills of Lading have been met.

77.     E.C.O. has failed or refused to release the original Bills of Lading or to cause BNP Paribas Fortis to do so.

78.     The foregoing acts and omissions constitute a material breach of the E.C.O. Contract.

79.     Michigan Salt has no adequate remedy at law as it will continue to be damaged in amounts not presently ascertainable if the Court does not immediately compel E.C.O. and BNP Paribas Fortis to release the original Bills of Lading to Michigan Salt.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANT E.C.O. FOR DAMAGES FOR BREACH OF CONTRACT

80.    Michigan Salt repeats and realleges paragraphs 1- 80 of this Complaint as if fully set forth herein.

81.    Michigan Salt fully performed its obligations under the E.C.O. Contract, including payment to E.C.O. in full and payment of all freight charges.

82.    E.C.O. supplied salt that did not meet the specifications of the E.C.O. Contract.

83.    E.C.O. failed to conduct the pre-shipment testing required by the E.C.O. Contract.

84.    E.C.O. failed to furnish the quality inspection documentation required by the E.C.O. Contract.

85.    E.C.O. failed to furnish the salt for shipment in a timely fashion, as required by the E.C.O. Contract.

86.    E.C.O. failed to pay demurrage charges incurred by Michigan Salt as a result of E.C.O.'s delays in effecting shipment, which charges were payable by E.C.O. under the E.C.O. Contract.

87.    E.C.O. failed supply salt with clean title, as required by the E.C.O. Contract.

88.    E.C.O.'s acts and omissions detailed in this Complaint constitute material breach of the E.C.O. Contract.

89.    As a direct result of E.C.O.'s breach of contract, Michigan Salt has sustained at direct and consequential damages (including lost profits), pre-judgment interest from at least May 30, 2011, and reasonable attorneys' fees and the cost of this action in an amount to be determined at trial but not less than $1,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANT E.C.O. TO COMPEL ARBITRATION

1.        Michigan Salt repeats and realleges paragraphs 1-90 of the Complaint as if fully set forth herein.

2.        The E.C.O. Contract does not contain an enforceable provision requiring the parties to submit disputes under the E.C.O. Contract to arbitration.

3.        In the alternative, in the event that the Court should determine nonetheless that the E.C.O. Contract does contain an enforceable arbitration provision, Michigan Salt is entitled to an order compelling E.C.O. to submit to arbitration in a venue convenient to Michigan Salt under arbitral rules to be determined by the Court.

4.        E.C.O.'s wrongful failure or refusal to release or cause BNP Paribas Fortis to release the subject Bills of Lading to Michigan Salt is a material breach of the E.C.O. Contract.

5.        Michigan Salt is entitled to an order attaching or seizing the salt in the Port of Coeymans as an aid to arbitration pursuant to the Federal Arbitration act, 9 U.S.C. §1 et seq.

WHEREFORE, Michigan Salt demands judgment as follows:

1.        On the First Cause of Action, compelling Scotwood to relinquish to Michigan Salt possession of 7,000 metric tons of bulk sea salt located at the Port of Coeymans, New York;

2.        On the Second Cause of Action, compelling Scotwood to submit its dispute with Michigan Salt under the Scotwood Contract to arbitration;

w:\18200\18294\plead\complaint 8-26-11.doc

3.      On the Third Cause of Action, compelling E.C.O. and BNP Paribas Fortis to release the original Bills of Lading to Michigan Salt;

4.      On the Fourth Cause of Action, awarding judgment against Defendant E.C.O. in an amount to be determined at trial but not less than $1,000,000;

5.      On the Fifth Cause of Action, in the event that this Court shall determine that the dispute between E.C.O. and Michigan Salt under the E.C.O. Contract must be arbitrated, then, as an alternative to the relief demanded in the Fourth Cause of Action, compelling E.C.O. to submit the dispute to arbitration in a forum convenient to Michigan Salt under rules to be determined by the Court; and

6.      Granting such other and further relief as the Court shall deem just and proper.

Dated: Albany, New York
        August 26, 2011

WHITEMAN OSTERMAN & HANNA LLP

By:
                Jean F. Gerbini, Esq.
                (Bar Roll No. 101761)
        Attorneys for Plaintiff
        One Commerce Plaza
        Albany, New York 12260
        (518) 487-7600
        (518) 487-7777 (fax)

w:\18200\18294\plead\complaint 8-26-11.doc